*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NATIONAL RETAIL PROPERTIES, LP,

        Plaintiff/Counterdefendant-Appellant,

v

FITNESS INTERNATIONAL, LLC,

        Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
October 12, 2023

No. 363909
Wayne Circuit Court
LC No. 20-014449-CB

Before: MURRAY, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

Plaintiff, National Retail Properties, LP (NRP), appeals as of right the trial court's opinion and order denying its motion for summary disposition in part and granting summary disposition in part in favor of defendant, Fitness International, LLC (Fitness). For the reasons explained in this opinion, we reverse the trial court to the extent that it denied NRP's motion for summary disposition.

## I. BACKGROUND

On June 30, 2015, the parties signed a lease agreement for land in Plymouth that designated NRP as the landlord and Fitness as the tenant (the Plymouth Lease). The initial term of the Plymouth Lease was 19 years, and Fitness had the option of extending the lease four times—the first extension would be for 6 years, and each additional extension would be for 5-year terms. On August 25, 2017, the parties signed a lease agreement for land in Livonia that designated NRP as the landlord and Fitness as the tenant (the Livonia Lease). The initial term of the Livonia Lease was 20 years, and Fitness had the option to extend the lease four times, with each extension lasting five years. The Plymouth Lease and the Livonia Lease will be referred to collectively as "the Leases."

As relevant to this appeal, Section 9.1 of the Leases provides in relevant part as follows:

> Tenant may use the Premises ("Initial Use") for the operation of a health club and fitness facility . . . . As part of the health club and fitness facility operated within the Building, Tenant may use portions of the Building for uses ancillary to a health club and fitness facility (hereinafter, the "Ancillary Uses") for members and non-members except as specifically set forth below, including . . . for such other use as

-1-

Tenant may determine in Tenant's reasonable business judgment, provided that such use: (i) is lawful; (ii) is in compliance with applicable environmental, zoning and land use laws and requirements; (iii) does not violate matters of record or restrictions affecting the Premises; (iv) does not conflict with any other agreement to which Landlord is bound, of which agreement Tenant has received written notice, where such conflict would materially adversely affect Landlord; (v) would not have a material adverse effect on the value of the Premises; and (vi) would not result in or give rise to any material environmental deterioration or degradation of the Premises. Notwithstanding the foregoing, in no event may the Premises be used as a factory, processing or rendering plant, massage parlor, peep show store, head shop store, topless or strip club, adult book or video store (which shall mean a store which primarily sells or offers for sale sexually explicit printed materials, audio or video tapes, or sexual devices), or flea market. . . .

And Section 9.2 provides:

Tenant, at Tenant's sole expense, promptly shall comply with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record including, without limitation, the Permitted Encumbrances, and requirements in effect during the term or any part of the term hereof, regulating the use by Tenant of the Premises, including, without limitation, the obligation at Tenant's cost, to alter, maintain, or restore the Premises in compliance and conformity with all laws relating to the condition, use or occupancy of the Premises during the term (including, without limitation, any and all requirements as set forth in the Americans with Disabilities Act) and regardless of (i) whether such laws require structural or non-structural improvements, (ii) whether the improvements were foreseen or unforeseen, and (iii) the period of time remaining in the term. Tenant shall be named as Landlord's representative with respect to all matters of governance under the Permitted Encumbrances. Tenant shall also comply, at Tenant's sole expense, with any applicable laws and regulations regarding the presence or remediation of mold on the Premises; provided, however, that Landlord and Tenant acknowledge mold to be naturally occurring and present in all buildings and outdoor areas, and the obligation of Tenant under this Section to comply with applicable laws and regulations regarding mold shall not be interpreted as a warranty that there will be no mold on the Premises during or at the expiration of the Term so long as such presence is not a violation of any such applicable laws and regulations.[1]

---

[1] The Plymouth Lease uses somewhat different language because it is part of a condominium development, but the pertinent language remains unchanged. The Plymouth Lease states:

Tenant, at Tenant's sole expense, promptly shall comply with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record (including, but not limited to the Master Deed, Consent Judgment, Declaration of Restrictions and Development Agreement), and requirements in effect during the term or any part of the term hereof, regulating the use by Tenant of the Premises . . . .

While the Leases were in effect, the COVID-19 pandemic struck. In an effort to stop the spread of the pandemic, Governor Gretchen Whitmer issued a serious of orders that, as relevant to this appeal, closed health and fitness facilities open to the public (the shutdown orders). The complete closures lasted from March 2020 until September 2020.

While Fitness continued to pay rent for most of the period that the shutdown orders were in effect, it refused to pay rent for August 2020 and September 2020. In response, NRP filed the complaint giving rise to this action on November 3, 2020. The complaint alleged two counts. Count I alleged that Fitness was in breach of the Livonia Lease because it failed to pay rent, and Count II alleged that Fitness was in breach of the Plymouth Lease because it failed to pay rent.

On December 7, 2020, Fitness filed a five-count countercomplaint. The only count relevant to this appeal is Count V. In that count, Fitness alleged that, during the time that Governor Whitmer ordered Fitness's health and fitness facilities closed, the purpose of the Leases was frustrated, and Fitness's performance under the Leases was otherwise "temporarily impossible" or impractical.

On August 17, 2021, NRP moved for summary disposition under MCR 2.116(C)(10). NRP argued that Fitness was in breach of the Leases due to its failure to pay rent under either lease, and that nothing excused Fitness's performance under the Leases. With respect to Fitness's frustration-of-purpose argument, NRP argued that Fitness could not establish that NRP knew Fitness's purpose in entering into the Leases. NRP conceded that it knew Fitness's purpose was to initially use the properties as health and fitness centers, but contended that it did not know whether Fitness intended to use the properties as health and fitness centers for the entire duration of the Leases because, under the Leases, Fitness retained the autonomy to use the properties for other purposes. NRP further argued that Fitness's frustration-of-purpose argument necessarily failed because, in the Leases, Fitness assumed the risk of complying with government orders regulating Fitness's use of the premises. Next, NRP argued that the doctrine of impossibility was inapplicable to this case because, while Fitness may have been unprofitable during the government-ordered closure, economic unprofitability does not render performance impossible under Michigan law.

On December 1, 2021, Fitness filed a response to NRP's motion for summary disposition, and counter-motioned for the trial court to grant summary disposition in favor of Fitness under MCR 2.116(I)(2). In its motion, Fitness argued that NRP was not entitled to summary disposition because Fitness established all of its affirmative defenses, which not only excused Fitness's performance under the Leases but entitled Fitness to abatement of all rent wrongfully collected during the time that Fitness was not permitted to use the leased premises. For its frustration-of-purpose argument, Fitness contended that the parties' purpose for entering into the Leases—which Fitness identified as Fitness's use of the premises as health and fitness centers—was frustrated. According to Fitness, NRP's contention that it was unaware of Fitness's purposes for entering into the Leases was "patently false" because the Leases themselves state that Fitness was to use the premises as health and fitness centers, and the parties agreed that Fitness would develop the leased land to build health and fitness centers. With respect to NRP's argument that Fitness assumed the risk of complying with government orders and regulations, Fitness argued that no portion of the Leases required Fitness "to bear all responsibility and expense for the government-mandated closures." According to Fitness, Section 9.2 of the Leases only related to "physical conditions, improvements, and alterations" to the leased premises. Fitness further argued that Section 9.2 only required Fitness to cover the "cost" or "expense" of complying with a government order, and that it did not "apply to the payment of rent." Similarly, Fitness argued that the doctrine of temporary impossibility applied

in this case because the government-ordered closure of Fitness's health centers made Fitness's operation of health and fitness centers on the property temporarily impracticable. Fitness explained that it "does not assert that its obligation to pay rent is excused due to economic unprofitability," but rather "that during the government mandated closure periods, [Fitness] had no use of the Premises because it was illegal for it to use the Premises," which caused Fitness to "generate[] no revenue and performance was rendered impracticable."

The trial court held a hearing on the parties' competing motions on January 12, 2022. The parties argued in line with their briefing. At the end of the hearing, the trial court said it would issue an opinion at a later date.

On February 3, 2022, the trial court issued a written opinion and order in which it denied NRP's motion for summary disposition in part and granted in part Fitness's motion for summary disposition under MCR 2.116(I)(2). As relevant to this appeal, the trial court concluded that Fitness's purpose in entering into the Leases was known to NRP because it was clear based on the Leases that Fitness intended to use the premises as a health and fitness center. The court next concluded that the government-ordered closure of all fitness clubs in Michigan frustrated Fitness's purpose in entering into the Leases, and that this event was not reasonably foreseeable when the parties agreed to the Leases. Accordingly, the trial court held that the doctrine of frustration of purpose applied in this case, and that the doctrine excused Fitness from paying rent under the Leases during the time of the government ordered closure. Turning to Fitness's impossibility argument, the trial court explained that there was no question of fact "that operation of fitness facilities was impossible during the time of the total shutdown," and accordingly concluded that Fitness was excused from performing under the Leases due to impossibility during the government-ordered closure.[2]

Eventually, on November 7, 2022, the trial court entered a final order in which it held that Fitness's rent under the Plymouth and Livonia Leases was abated from March 17, 2020 to September 9, 2020, and accordingly ordered NRP to pay Fitness $376,973.30 "representing the abated rent due to Fitness . . . for the period of total government closure under both the Plymouth and Livonia Leases." The trial court also ordered Fitness to pay NRP $107,094.62 "representing the amounts due under both the Plymouth and Livonia Leases[] for the period after September 9, 2020." This was the final order closing the case, and this appeal followed.

II. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo. *McMaster v DTE Energy Co*, 509 Mich 423, 431; 984 NW2d 91 (2022). NRP moved for summary disposition under MCR 2.116(C)(10). Summary disposition under MCR 2.116(C)(10) is proper when "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "A genuine issue of material fact exists when the record, giving the benefit of

---

[2] Notably, the trial court did not address the significance, if any, of Section 9.2 of the Leases, despite acknowledging that the parties disputed the significance of this section.

reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013).

The initial burden in a motion under MCR 2.116(C)(10) rests with the moving party, who can satisfy its burden by either (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996) (quotation marks and citation omitted). In response to a properly supported motion under MCR 2.116(C)(10), the nonmoving party cannot "rest on mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial." *Campbell v Kovich*, 273 Mich App 227, 229; 731 NW2d 112 (2006).

Fitness countered NRP's motion for summary disposition by requesting summary disposition under MCR 2.116(I)(2). That rule provides, "If it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party." MCR 2.116(I)(2).

### III. ANALYSIS

On appeal, NRP argues that the trial court erred by concluding that the doctrines of frustration of purpose and impossibility temporarily excused Fitness's performance under the Leases. We agree.[3]

### A. FRUSTRATION OF PURPOSE

"The frustration-of-purpose doctrine provides an excuse for nonperformance of a contractual obligation." *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 159; 742 NW2d 409 (2007). For the doctrine to apply, the following conditions must be present:

> (1) the contract must be at least partially executory; (2) the frustrated party's purpose in making the contract must have been known to both parties when the contract was made; (3) this purpose must have been basically frustrated by an event not reasonably foreseeable at the time the contract was made, the occurrence of which has not been

---

[3] We acknowledge that the trial court held that Fitness's performance under the Leases was *temporarily* discharged, such that both parties' obligations under the Leases currently remain in effect. Neither the parties nor the trial court have cited any binding caselaw in which a Michigan court has recognized that frustration of purpose and impossibility may be temporary. According to Fitness, NRP's failure to brief the issue means that this Court cannot address it. In the words of our Supreme Court, however, "The jurisprudence of Michigan cannot be, and is not, dependent upon whether individual parties accurately identify and elucidate controlling legal questions." *Mack v City of Detroit*, 467 Mich 186, 209; 649 NW2d 47 (2002). Thus, the fact that NRP did not brief the issue does not mean that this Court must necessarily adopt a doctrine that no binding caselaw in this state has ever before recognized. That said, for purposes of this opinion, we will assume without deciding that the doctrines of frustration of purpose and impossibility may be temporary.

due to the fault of the frustrated party and the risk of which was not assumed by him. [*Liggett Rest Group, Inc v City of Pontiac*, 260 Mich App 127, 134-135; 676 NW2d 633 (2003).]

While the parties dispute the second and third elements, we only address the third element because we conclude that element is dispositive. Namely, we conclude that the trial court erred by holding that the doctrine of frustration of purpose applied under the facts of this case because Fitness assumed the risk of complying with the shutdown orders in Section 9.2 of the Leases.

Section 9.2 of the Livonia Lease provides in pertinent part:

Tenant, at Tenant's sole expense, promptly shall comply with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record including, without limitation, the Permitted Encumbrances, and requirements in effect during the term or any part of the term hereof, regulating the use by Tenant of the Premises, including, without limitation, the obligation at Tenant's cost, to alter, maintain, or restore the Premises in compliance and conformity with all laws relating to the condition, use or occupancy of the Premises during the term (including, without limitation, any and all requirements as set forth in the Americans with Disabilities Act) and regardless of (i) whether such laws require structural or non-structural improvements, (ii) whether the improvements were foreseen or unforeseen, and (iii) the period of time remaining in the term.

Section 9.2 of the Plymouth Lease uses somewhat different language, but the pertinent language is unchanged.

In this section, Fitness plainly assumed the risk of complying with government orders regulating the use of the premises. The section states, "Tenant . . . shall comply with all applicable . . . orders . . . in effect during the term or any part of the term hereof, regulating the use by Tenant of the Premises . . . ." This section of the Leases is plain and unambiguous; it therefore does not require any judicial interpretation and must be enforced as written. See *Rory v Cont'l Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005) ("A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*."). In this section, Fitness assumed the risk of complying with any order in effect during the term of the Leases regulating the use of the premises; the section states that Fitness *shall* comply with *all applicable orders* regulating Fitness's use of the premises at Fitness's *sole* expense. This necessarily includes the shutdown order restricting use of the premises as health and fitness facilities in an effort to stop the spread of COVID-19. Accordingly, because Fitness assumed the risk of complying with orders regulating the use of the premises, it cannot now assert the doctrine of frustration of purpose. See *Liggett*, 260 Mich App at 135 (explaining that the doctrine of frustration of purpose applies only if "the risk of which was not assumed by" the party asserting the doctrine).

Fitness's arguments against this result are unpersuasive. First, Fitness asserts, "The Leases do not expressly allocate the risk of an unforeseeable global pandemic or unprecedented government shutdown orders to Fitness." This statement is not completely accurate because the Leases *do* expressly allocate the risk of complying with government orders to Fitness. Fitness concedes as much in its brief. Fitness states that Section 9.2 "required [it] to comply with the orders by ceasing

operations and, if Fitness incurred any expenses to comply with the Orders, those expenses were Fitness's to bear."

Fitness next asserts that it "is not refusing to comply with the Orders, nor is Fitness asking that Landlord pay expenses Fitness incurred by complying with the Orders, such as paying to secure the Premises while they were closed, making reliance on § 9.2 to resolve the frustration of purpose issue inapposite." Respectfully, this argument misses the point. By explicitly agreeing to comply with orders regulating the use of the premises, Fitness assumed the risk of such compliance. It is irrelevant whether Fitness is refusing to comply with the orders or asking NRP to pay Fitness's expenses for that compliance; the point is that Fitness assumed the risk of compliance. By assuming the risk of complying with orders regulating the use of the premises, Fitness cannot now argue that its compliance with orders regulating the use of the premises frustrated the purpose of the Leases.

Fitness also contends that Section 9.2 is inapplicable because Fitness is only asking for its rent to be abated, and Section 9.2 does not address rent; according to Fitness, Section 9.2 only addresses the "expense" of complying with government orders, and rent is not an "expense." This argument also misses the point. Once again, it is not relevant whether Section 9.2 addresses rent; because Fitness assumed the risk of complying with government orders regulating the use of the premises, Fitness was still required to perform under the Leases while doing so. This includes, in relevant part, paying rent.

Fitness next argues that, in Section 9.2 of the Leases, Fitness only agreed to assume the risk of complying with orders *regulating* its use of the premises, not orders *prohibiting* its use of the premises. The problem with this argument, however, is that prohibiting certain uses of the premises *is* regulating the use of the premises, and Fitness has only ever asserted that the shutdown orders prohibited Fitness from using the premises as health and fitness facilities. In other words, Fitness makes a distinction without a difference—by prohibiting Fitness from using the premises for certain purposes, the shutdown orders regulated Fitness's use of the premises. There is no need to resort to a dictionary to understand the plain meaning of Section 9.2 as applied to this case. This is also consistent with how this Court interpreted similar shutdown orders as "regulating" the "use" of property in *Gavrilides Mgt Co, LLC v Michigan Ins Co*, 340 Mich App 306, 320; 985 NW2d 919 (2022).[4]

Briefly, Fitness also argues that it "was deprived of consideration for its payment of rent" during the time that the shutdown orders were in effect because it could not use the premises as health and fitness facilities, and, therefore, was not responsible for rent under the Leases during that time. Yet Fitness does not explain how a party to a contract can agree to assume a certain risk and then, when an event encompassed by the assumed risk occurs, avoid performance under the contract by arguing that the occurrence of the event rendered the contract without consideration. *Yee v*

---

[4] We also acknowledge that a panel of this Court has already addressed the same arguments between the same parties interpreting identical provision of different leases. See *Fitness Int'l, LLC v National Retail Props LP*, unpublished per curiam opinion of the Court of Appeals, issued October 13, 2022 (Docket Nos. 358680; 358983), slip op at 5. The result reached in this opinion is consistent with the result reached there.

*Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."). Moreover, Fitness cites no relevant caselaw holding that the specific use of a property is the necessary consideration for a lease, so it has abandoned the argument in this way as well. See *id*.[5]

## B. IMPOSSIBILITY

The doctrine of impossibility is related to the doctrine of frustration of purpose—both are "excuses for nonperformance of contractual obligations and are governed by similar principles." *Liggett*, 260 Mich App at 133. One of the main differences is that, under the doctrine of impossibility, there is something actually impeding a party's ability to perform its contractual obligations. See *id*. at 134. See also Restatement (Second) of Contracts § 265, comment a (explaining that the doctrine of frustration of purpose "is distinct from the problem of impracticability dealt with in the four preceding sections because there is no impediment to performance by either party"). The doctrine acts to excuse a promisor's performance under a contract "in the event his or her contractual promise becomes objectively impossible to perform." *Roberts v Farmers Ins Exch*, 275 Mich App 58, 73; 737 NW2d 332 (2007). See also Restatement (Second) of Contracts § 261 ("Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."). "Although absolute impossibility is not required, there must be a showing of impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." *Roberts*, 275 Mich App at 74. See also Restatement (Second) of Contracts § 261, comment d ("Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved.").

---

[5] The only case that Fitness relies on for its argument—*Grinnell Bros v Asiuliewicz*, 241 Mich 186; 216 NW 388 (1927)—has nothing to do with consideration. It concerns a claim for breach of quiet enjoyment. That case states, in relevant part:

> There goes with every rental of premises the right of beneficial enjoyment by the tenant for the purpose for which the premises are rented, at least to the extent disclosed to the lessor at the making of the lease. Such enjoyment the landlord may not destroy or seriously interfere with, in use by himself or permitted use by others, of any part of the premises occupied in conjunction therewith. This case does not rest upon the law of eviction, actual or constructive, but upon the right of plaintiff to have beneficial enjoyment of the premises leased. [*Id*. at 188-189.]

In the trial court, Fitness argued that NRP had breached the covenant of quiet enjoyment, but the trial court rejected that argument. In its brief, Fitness explicitly states that it is not challenging that ruling on appeal.

Dispositive to this issue is the principle that the doctrine of impossibility will not apply where a party assumed the risk of performance despite the impracticability. See *Frank's Nursery Sales, Inc v American Nat'l Ins Co*, 388 F Supp 76, 82 (ED Mich, 1974). See also Restatement (Second) of Contracts § 261, comment c; Restatement (Second) of Contracts § 264, comment a ("With the trend toward greater governmental regulation . . . parties are increasingly aware of such risks, and a party may undertake a duty that is not discharged by such supervening governmental actions[.]"). Here, Fitness complains that its performance under the Leases was rendered impracticable because of the shutdown orders, but, for the reasons already explained, Fitness assumed the risk of complying with orders regulating the use of the premises in Section 9.2 of the Leases. It follows that Fitness cannot now assert the doctrine of impossibility based on its compliance with a risk it agreed to assume.[6]

Even addressing the merits of the doctrine apart from an assumption-of-risk analysis, we would conclude that NRP was entitled to summary disposition on the issue. As explained by the Restatements (Second) of Contracts, when a party is asserting impossibility based on a government order, "The regulation or order *must directly affect a party's performance* in such a way that it is impracticable for him both to comply with the regulation or order and to perform." Restatement (Second) of Contracts § 264, comment b (emphasis added). Here, Fitness asserts that "during the Closure Period, it was illegal for Fitness to use the Premises, so Fitness was not able to operate its business and generate income." Fitness in turn claims that this loss of revenue rendered its contractual obligation to pay rent extreme or unreasonable.

While, at least as far as can be discerned from the record, it is true that Fitness was not earning revenue from its use of the premises while the shutdown orders were in effect, Fitness has never alleged that this in any way impeded its performance under the Leases. In fact, Fitness repeatedly asserted in the trial court that it was not asserting that it had a financial inability to pay rent, including in an affidavit filed by its Director of Lease Administration, who averred that Fitness "does not claim in this action that it had a financial inability to pay Rent . . . ." If the lack of revenue did not affect Fitness's financial ability to pay rent, then it is unclear how the lack of revenue impeded Fitness's ability to perform its contractual obligation to pay rent. Because the focus on the doctrine of impossibility is on the effect that an event had on a party's performance of its contractual obligations, it is unclear exactly how the doctrine applies here.

Fitness contends that the fact that it was able to pay rent while the shutdown orders were in effect is "irrelevant," but its reasoning for why is difficult to follow. Fitness appears to believe that the doctrine of impossibility is not necessarily concerned with whether performance of a contractual obligation is impracticable, but rather "whether a change in circumstances makes performance an extreme or unreasonable economic hardship by considering the expense, injury and loss involved in performing." While this is correct to the extent that the focus of the doctrine of impossibility is on

---

[6] Fitness also argues that the "doctrine of impracticability" excused its performance under the contract, but the doctrine of impracticability is not treated as distinct from the doctrine of impossibility in either the Restatements (Second) of Contracts or in Michigan caselaw. See Restatement (Second) of Contracts § 261, comment d; *Roberts*, 275 Mich App at 74.

whether some event has rendered a party's performance extreme or unreasonable, it is simply untrue that this in turn renders the fact that a party was able to perform under the contract "irrelevant."

Fitness's entire impossibility argument is not based on record evidence but on Fitness's unsupported claims to that effect—Fitness asserts that requiring it to pay rent under the Leases while the shutdown orders were in effect would work an extreme or unreasonable loss upon Fitness because Fitness was not earning revenue during that time. Yet nothing in the record establishes how much revenue Fitness was earning before the shutdown orders went into effect, or how the loss of that revenue actually impacted Fitness's ability to pay its rent. See Restatement (Second) of Contracts § 264, comment b (explaining that, to establish impossibility based on a government order or regulation, "[t]he regulation or order must directly affect a party's performance"). If Fitness so desired, it could open up its books and demonstrate to the Court how requiring it to pay rent while it was not generating revenue would result in an "extreme or unreasonable" loss to Fitness, but it chose not to do so. Instead, Fitness merely asserts that this Court should conclude that requiring Fitness to pay rent while the shutdown orders were in effect would work an extreme or unreasonable hardship on Fitness based solely on Fitness's assertion to that effect.

This in turn is why the fact that Fitness was financially able to pay rent is relevant. While not dispositive, it supports NRP's assertion that it was not impractical for Fitness to pay rent. In response to a well-supported motion for summary disposition, Fitness cannot rely on mere assertions, but must present substantive evidence rebutting NRP's motion. *Campbell*, 273 Mich App at 229. Again, the only evidence that Fitness relies on in support of its contention that it would be extreme or unreasonable for it to pay rent is its assertions that it would be. Because this is not enough to rebut NRP's well-supported motion, NRP was entitled to summary disposition on this claim.

For the reasons explained in this opinion, the trial court's opinion and order is reversed to the extent that it held that Fitness was excused from its contractual obligations to pay rent under the Leases by the doctrines of frustration of purpose and impossibility. The case is remanded for the trial court to enter an order granting summary disposition to NRP.

Reversed in part and remanded. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle

-10-